UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| TOWN OF WAYLAND, MASSACHUSETTS, | ) | |
| Plaintiff, | ) | MDL No. 2873 |
| | ) | |
| v. | ) | |
| | ) | Master Docket No. 2:18-mn-2873 |
| 3M COMPANY (f/k/a Minnesota Mining and | ) | |
| Manufacturing, Co.), AGC CHEMICALS | ) | Judge Richard Mark Gergel |
| AMERICAS, INC., ARCHROMA U.S., INC., | ) | |
| ARKEMA, INC., BUCKEYE FIRE | ) | Civil Action No.   2:23-cv-00248-RMG |
| EQUIPMENT COMPANY, CHEMGUARD, | ) | |
| INC., CORTEVA, INC., DUPONT DE | ) | |
| NEMOURS, INC., DYNAX CORPORATION, | ) | COMPLAINT AND DEMAND FOR |
| E.I. DU PONT DE NEMOURS AND | ) | JURY TRIAL |
| COMPANY, JOHN DOE DEFENDANTS 1-49, | ) | |
| KIDDE FENWAL, INC., NATIONAL FOAM, | ) | |
| INC., THE CHEMOURS COMPANY L.L.C. | ) | |
| F/K/A THE CHEMOURS COMPANY, and | ) | |
| TYCO FIRE PRODUCTS LP (successor-in- | ) | |
| interest to the Ansul Co.), | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

### SUMMARY OF THE CASE

1.     Plaintiff, the Town of Wayland, Massachusetts ("Plaintiff"), owns and operates a water system that provides drinking water to residents and businesses in Wayland, Massachusetts. Plaintiff brings this action to recover the substantial costs necessary to protect and restore its drinking water supply wells, which have been infiltrated with synthetic per- and polyfluoroalkyl substances ("PFAS").

2.     Plaintiff brings this action to address widespread infiltration of stormwater, surface water and groundwater that provides drinking water to Plaintiff with PFAS, to recover costs associated with the impacts to drinking water, stormwater, surface water, and groundwater with

PFAS, and further seek abatement of the ongoing nuisance these chemicals constitute in the environment, and for such other action as is necessary to ensure that the PFAS that infiltrated the stormwater, surface water and aquifers supplying drinking water for Plaintiff does not present a risk to the public. In this Complaint, the term PFAS, includes without limitation, perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), as well as all of their salts and ionic states as well as the acid forms of the molecules and their chemical precursors.

3.     PFAS are persistent, toxic, and bioaccumulative compounds when released into the environment. PFAS have impacted stormwater, surface water and groundwater, and now infiltrate the water pumped from the Plaintiff's water supply wells.

4.     Defendants are companies that designed, manufactured, marketed, distributed, and/or sold PFAS, the chemical precursors of PFAS, and/or products containing PFAS, and/or their chemical precursors. Defendants made products with PFAS including but are not limited to, Teflon®, Scotchgard®, waterproofing compounds, stain-proofing compounds, waxes, cloth coatings, paper and food package coatings like Zonyl®, aqueous film-forming foam ("AFFF"), a firefighting agent used to control and extinguish Class B fuel fires, and fluorosurfactants used in the manufacture of AFFF as well as telomer building blocks used to make fluorosurfactants that were then used to manufacture other PFAS-containing products, including AFFF. Collectively, Defendants' PFOA, PFOS, precursors, products containing PFAS, AFFF, and other products and intermediates containing PFAS are referred to herein as "Fluorochemical Products."

5.     Defendants designed, advertised, manufactured, marketed, distributed, stored and/or sold Fluorochemical Products with the knowledge that these toxic compounds would be released into the environment during fire protection, fire training, and response activities, even when used as directed and intended by defendants.

6.     Defendants were also aware that their Fluorochemical Products would be and have been used, released, stored, and/or disposed of at, near, or within the vicinity of Plaintiff's impacted wells such that PFOS and PFOA, and their chemical precursors would enter the environment, migrate through the soil, sediment, stormwater, surface water, and groundwater, thereby infiltrating the water that supplies Plaintiff's wells ("Plaintiff's Water Supplies"). Plaintiff has detected PFAS in all samples tested.

7.     As a result of the use of defendants' Fluorochemical Products for their intended purpose, PFOS, PFOA, and/or other forms of PFAS have been detected in Plaintiff's drinking water supply wells at levels exceeding either Massachusett's Maximum Contamination Level ("MMCL") or the Environmental Protection Agency's health advisory levels for PFOS and PFOA.

8.     Defendants knew or reasonably should have known that their PFAS compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten public health and welfare.

9.     Plaintiff files this lawsuit to seek abatement of an ongoing nuisance, to recover compensatory and all other damages and relief, including all necessary funds to compensate Plaintiff for the costs of investigating and remediating drinking water supplies impacted by PFAS; designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS from public water supplies; and for such other damages and relief the Court may order. Such costs include all necessary funds to investigate, monitor, assess, evaluate, remediate, abate, or contain infiltrated groundwater resources that are polluted with PFAS.

## PARTIES

10.     Plaintiff is a Town in Middlesex County, Massachusetts, having its principal place of business at 41 Cochituate Road, Wayland, Massachusetts 01778. Plaintiff operates a public water system with approximately 5,380 residential and commercial connections that serve a population of approximately 14,500.  Customers are provided potable water supplied from nine active wells and one treatment plant, which will be referred to collectively in this Complaint as Plaintiff's Water Supplies.



11.    Upon information and belief, Defendants' Fluorochemical Products, including, but not limited to, PFAS containing fluorochemicals/intermediates and AFFF, were used at fire training facilities, and/or fire departments such that those compounds traveled by stormwater, surface water, groundwater, and infiltrated Plaintiff's Water Supplies. Defendants' Fluorochemical Products have also been used and disposed of into wastewater systems, causing infiltration to stormwater, surface water, and groundwater that traveled to Plaintiff's drinking water supply wells.

12.    Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133, and is registered to do business in Massachusetts.

a.    Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold Fluorochemical Products. 3M manufactured, distributed, and sold AFFF containing PFOS throughout the United States, including in Massachusetts. 3M was the only company that manufactured or sold AFFF containing PFOS.

b.    3M researched, developed, manufactured, designed, marketed, distributed, released, promoted, and/or otherwise sold products and raw materials containing PFAS in markets around the country, including within Massachusetts, since at least the 1970s. These product and raw material sales were based on intentional direction at the Massachusetts market for these products and raw materials and availment of Massachusetts laws.

13.    Defendant Tyco Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware with its principal place of business at 1400 Pennbrook Parkway, Landsdale, Pennsylvania. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls

International plc, an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI]. Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990. (Ansul and Tyco, as the successor in interest to Ansul, will hereinafter be collectively referred to as "Tyco/Ansul.") Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained fluorochemical surfactants containing PFOA throughout the United States, including in Massachusetts. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute, and sell AFFF that contained fluorocarbon surfactants containing PFOA throughout the United States, including in Massachusetts. Tyco does business throughout the United States and is registered to do business in the state of Massachusetts. Upon information and belief, Tyco manufactured, distributed, and/or sold AFFF foam containing PFOA, which was used in Massachusetts.

14.     Defendant Chemguard, Inc. is a Texas corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA. Upon information and belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing PFOA throughout the United States, including in Massachusetts. Upon information and belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing PFOA, which has infiltrated Plaintiff's Water Supplies.

15.     Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Beginning in or around 2004, Buckeye manufactured, distributed, and/or sold AFFF containing PFOA. Buckeye does business throughout the United States. Upon information and belief, Buckeye manufactured, distributed, and/or sold

6

AFFF foam containing PFOA in Massachusetts and which has infiltrated Plaintiff's Water Supplies.

16.    Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721, and is registered to do business in Massachusetts. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde-Fenwal does business throughout the United States. Kidde-Fenwal, Inc. was part of UTC Fire & Security Americas Corporation, Inc. Upon information and belief, Kiddie-Fenwal manufactured, distributed, and/or sold AFFF foam containing PFOA in Massachusetts and which has infiltrated Plaintiff's Water Supplies. Kidde-Fenwal, Inc. was part of UTC Fire & Security Americas Corporation, Inc., which is now a division of Carrier Global Corporation.

17.    Defendant National Foam, Inc. (a/k/a Chubb National Foam) is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382. National Foam manufactures the Angus brand of products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). At all relevant times, National Foam manufactured fire suppression products, including AFFF that contained PFAS compounds. Upon information and belief, National Foam manufactured, distributed, and/or sold AFFF foam containing PFOA in Massachusetts and which has infiltrated Plaintiff's Water Supplies.

18.    Defendant Arkema, Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406. Arkema and/or its predecessors manufactured fluorosurfactants used in AFFF. Arkema

is a successor in interest to Atochem North American, Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. and does and/or has done business throughout the United States and is registered to business in the state of Massachusetts.

19.    AGC Chemicals Americas Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC and/or its affiliates manufactured fluorochemicals used in AFFF. AGC does and/or has done business throughout the United States. On information and belief, AGC is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass, Co., Ltd.) and does business throughout the United States, including in Massachusetts.

20.    Defendant Dynax Corporation ("Dynax") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544, and is registered to business in the state of Massachusetts. Dynax manufactured fluorosurfactants used in AFFF and does and/or has done business throughout the United States, including in Massachusetts.

21.    Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorochemical Products for use in AFFF sold throughout the United States, including in Massachusetts where it is registered to do business. On information and belief, Archroma is a successor to Clariant Corporation, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc.

22.     Defendant E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has done business throughout the United States, including conducting business in Massachusetts where it is registered to do business.

a.     Old DuPont has been involved in the production and sale of fluorochemical intermediaries for use in AFFF manufacturing since the 1950s. When 3M left the market, Old DuPont took on a larger role in the AFFF market.

b.     Old DuPont has also manufactured, distributed, and sold Fluorochemical Products and raw PFAS chemicals around the country pursuant to a nationwide marketing campaign, including in Massachusetts.

c.     Also on information and belief, Old DuPont was engaged in joint ventures and other business arrangements with Massachusetts entities for the development of Fluorochemical Products.

23.     Defendant The Chemours Company ("Chemours") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899, and is registered to do business in Massachusetts. Chemours does business throughout the United States, including conducting business in Massachusetts.

a.     Chemours was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont completed its spin-off of Chemours as a separate publicly traded entity.

b.     Chemours has received and begun manufacturing certain product lines from Old DuPont, including some product lines involving manufacture, sale, and distribution of PFAS-containing intermediates and Fluorochemical Products.

c. In connection with the spin-off, Chemours assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in Massachusetts, around the country, and indeed the world.

24. Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. New DuPont does business throughout the United States, including in Massachusetts.

a. New DuPont assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in Massachusetts, around the country, and indeed the world.

25. Defendant Corteva, Inc. ("Corteva") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Center Road, Wilmington, Delaware 19805, and is registered to do business in Massachusetts. Corteva does business throughout the United States, including conducting business in Massachusetts.

a. Corteva assumed direct liability for Old DuPont's decades long history of causing widespread PFAS contamination in Massachusetts, around the country, and indeed the world.

26. Upon information and belief, Defendant John Does 1-49 were manufacturers, distributors, and/or sellers of Fluorochemical Products. Although the identities of the John Doe Defendants are currently unknown, Plaintiff expects that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those entities' actual names to the complaint as defendants.

27.     Any and all references to a defendant or defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named defendants.

**JURISDICTION AND VENUE**

28.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and amount in controversy exceeds $75,000.

29.     Plaintiff is filing this complaint as permitted by Case Management Order No. 3 (CMO 3) issued by Judge Richard M. Gergel of this Court. Pursuant to CMO 3, Plaintiff designates the United States District Court for the District of Massachusetts as the "home venue" where Plaintiff would have otherwise filed suit pursuant to 28 U.S.C. § 1391. But for CMO 3, venue is proper in the United States District Court for District of Massachusetts in that the events or omissions giving rise to the claim occurred in that district. Plaintiff respectfully requests that at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for the District of Massachusetts.

30.     The United States District Court for the District of Massachusetts has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants purposefully manufactured, designed, marketed, advertised, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing Fluorochemical Products, including AFFF, to various locations in the United States and Massachusetts, such that each Defendant knew or should have known that said products would be delivered to areas in Massachusetts for active use including, but not limited to, during the course of training and firefighting activities, including areas within Plaintiff's Water System.

31.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the Defendants engaged in and were authorized to do business in the State of Massachusetts.

32.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the Defendants have engaged in substantial, continuous economic activity in Massachusetts, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, advertising and/or otherwise being responsible for PFAS, and/or products that contain PFAS, and that said activity by the Defendants is substantially connected to the Plaintiff's claims as alleged herein.

33.     Based on information and belief, the Defendants purposefully affiliated themselves with the forum of the State of Massachusetts giving rise to the underlying controversy. Such purposeful availment and activities within and related to the State of Massachusetts are believed to include, but are not limited to: 1) the Defendants' contractual relationships with the entities giving rise to researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for PFAS, and/or products that contain PFAS, and that said activity is substantially connected to the Plaintiff's claims as alleged herein; 2) agreements between the Defendants and entities, institutions and thought leader academics within the State of Massachusetts regarding the PFOS, PFOA, and/or products that contain PFOS and/or PFOA where the Defendants contractually consented to have state courts within the State of Massachusetts adjudicate disputes; 3) conducted purposeful and direct promotion, marketing, advertising, selling, and advising third-party sellers of, the PFOS, PFOA, and/or products that contain PFOS and/or PFOA, targeted specifically to consumers and businesses within the State of Massachusetts; 4) lobbying, consulting, and advisory efforts on behalf of the Defendants with regard to the PFOS, PFOA, and/or products that contain PFOS and/or PFOA stemming from law firms and other agents in the State of Massachusetts; and 5) other actions by Defendants targeted to the State of Massachusetts to be obtained through

discovery and other means. As the location from which the Defendants' suit-related conduct arose, Massachusetts has a substantial vested interest in the acts of the Defendants which led to the underlying controversy.

34.     At all times herein mentioned, the Defendants, each of them, had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants to Plaintiff.

35.     Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the District of Massachusetts does not offend traditional notions of fair play and substantial justice.

## BACKGROUND AND FACTUAL ALLEGATIONS
## THE PFAS COMPOUNDS

36.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.

37.     PFAS have been prevalently used for decades in industrial settings and in the production of thousands of common household and commercial products, including those that are heat resistant, stain resistant, long lasting, and water and oil repellant.

38.     The PFAS family of chemicals are entirely anthropogenic and do not exist in nature.

39.     PFOA and PFOS are PFAS that are known to have characteristics that cause extensive and persistent environmental contamination.

40.     Specifically, PFOA and PFOS are persistent, toxic, and bioaccumulative, as well as highly mobile in soil and groundwater.

41.     PFOA and PFOS are mobile in that they are soluble and do not easily adsorb (stick) to soil particles.

42.     PFOA and PFOS are readily transported through the air and in stormwater, as well as the soil and into groundwater where they can migrate long distances.

43.     PFOA and PFOS are persistent in that they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems for drinking water or wastewater.

44.     PFOA and PFOS are thermally, chemically, and biologically stable in the environment and resistant to biodegradation, atmospheric photo-oxidation, direct photolysis, and hydrolysis.

45.     Once PFOA and/or PFOS are applied, discharged, disposed of, or otherwise released onto land or into the air, soil, sediments, or water, they migrate through the environment and into stormwater, surface water and groundwater.

46.     PFOA and PFOS resist natural degradation and are difficult and costly to remove from soil and water.

47.     PFOA and PFOS bioaccumulate, biopersist, and biomagnify in the food web, including in people and other organisms.

48.     Exposure to PFOA and PFOS has been associated with several negative health outcomes in both humans and animals, including, but not limited to, the following:

a.      Altered growth, learning, and behavior of infants and older children;

b.      Lowering a woman's chance of getting pregnant;

c.      Interference with the body's natural hormones;

d.      Increased cholesterol levels;

e.      Modulation of the immune system;

f.      Increased risk of certain cancers;

g.      Increased risk of thyroid disease;

h.      Increased risk of pre-eclampsia; and

i.      Increased risk of ulcerative colitis.

49.      Contamination from PFOA and/or PFOS presents a threat to public health and the environment.

50.      In addition to drinking contaminated water, humans can be exposed to PFOA and PFOS through inhalation, ingestion of contaminated food, and dermal contact.

51.      PFOA and PFOS enter the environment from industrial facilities that use PFAS in the manufacture or production of other products.

52.      Releases of PFAS to land, air, and water from industrial sites are known pathways to the environment for PFOA and PFOS.

53.      Due to their widespread use in consumer and commercial products, PFAS may also enter the environment from wastewater treatment facilities after the products containing them have been disposed of in landfills, during the use of the products, or in other manners.

54.      On information and belief, PFAS have been released into the environment from these various pathways of infiltration to surface and groundwater in and around Plaintiff's Water Supplies.

55.      In the same way that PFAS are released from consumer products through their disposal in landfills, PFAS are also released from consumer products directly into the wastewater stream, *e.g.*, by laundering PFAS-coated clothing, through use of PFAS-containing home care products, like Scotchgard®, Stainmaster®, Polartec®, and Gore-tex® fabric coatings and cleaners, paper and food package coatings like Zonyl®, and through use of PFAS-containing cook wear, including Teflon®.

56.     Also, on information and belief, the Defendants sold PFAS and/or PFAS-containing products to companies with Massachusetts locations that Defendants knew or should have known would be used and/or disposed of in Massachusetts.

57.     3M and Old DuPont branded products are sold throughout the United States and inside Massachusetts based on nationwide advertising and marketing campaigns.

58.     Old DuPont (and later Chemours) branded intermediate products, including (for example) automobile-coating products, are sold to and applied within Middlesex County, which coatings would have been applied at and pursuant to Old DuPont's (and later Chemours') instruction and, on information and belief, with training from Old DuPont (and later Chemours).

59.     Defendants have directed PFAS or PFAS-containing products and intermediates to Massachusetts consumers or businesses for consumption and disposal in Massachusetts.

60.     All the while, the Defendants have known of health and environmental risks associated with PFAS compounds for decades but concealed that knowledge until it was exposed through litigation and regulatory action in relatively recent years.

61.     The Defendants' manufacture, distribution and/or sale of PFOA and/or PFOS and/or products containing PFOA and/or PFOS resulted in the release of PFOS and/or PFOA into the environment in Massachusetts.

62.     Through their involvement and/or participation in the creation of consumer or other commercial products and materials and related training and instructional materials and activities, the Defendants knew, foresaw, and/or should have known and/or foreseen that PFOA and/or PFOS would contaminate the environment.

63.     The Defendants knew, foresaw, and/or should have known and/or foreseen that their marketing, promotion, advertising, development, manufacture, distribution, release, training

of users of, production of instructional materials about, sale and/or use of PFOA and/or PFOS containing materials, including in Massachusetts, would result in the infiltration of the groundwater that is the primary source of water supply for Plaintiff's drinking water supply system.

64.     The Defendants' products were unreasonably and inherently dangerous and the Defendants failed to warn of this danger.

## THE PLAINTIFF'S DRINKING WATER SUPPLY

65.     On information and belief, Plaintiff's drinking water supply wells have been impacted by use and discharge of Fluorochemical Products, including AFFF, such that Fluorochemical Products has traveled via surface water, stormwater and groundwater to infiltrate Plaintiff's drinking water supply wells.

66.     PFAS have impacted surface water, stormwater and groundwater, and now infiltrate the water pumped from Plaintiff's water supply wells.

67.     Because of the risks that PFAS pose to human health, the State of Massachusetts regulates PFAS in drinking water at very low levels.

68.     The Massachusetts Maximum Contaminant Level ("MMCL") is 20 parts per trillion for the sum of the following PFAS compounds: PFOS, PFOA, perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), perfluoroheptanoic acid ("PFHpA"), perfluorodecanoic acid ("PFDA"). https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#drinking-water-standards-and-health-information-, (last accessed January 2023)

69.     In June 2022, the federal EPA issued new interim lifetime drinking water health advisories of 0.004 ppt for PFOA and 0.02 ppt for PFOS in drinking water.

70.    Defendants' PFAS has been detected in each of Plaintiff's water treatment plants in excess of the MMCL or health advisory levels and in several of Plaintiff's drinking water wells.

### 3M COMPANY'S MANUFACTURE AND DISTRIBUTION OF PFAS

71.    For most of the past seven decades through the early 2000s, 3M was the primary manufacturer of PFOS in the United States.

72.    3M is the only known manufacturer of PFOS in the United States.

73.    3M began producing PFOS and PFOA as raw materials or ingredients that it used to produce other products, or that it sold to third parties for use in other products.

74.    3M produced PFOS by electrochemical fluorination beginning in the 1940s.

75.    Electrochemical fluorination results in a product that contains and/or breaks down into compounds containing PFOS and/or PFOA.

76.    3M went on to market and promote PFAS and shipped PFAS to manufacturers, including Old DuPont, throughout the United States, including Massachusetts. 3M made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to Massachusetts and throughout the country for decades until announcing in 2000 that it would cease production of PFOA and PFOS (described in more detail below).

### OLD DUPONT'S USE AND MANUFACTURE OF PFOA

77.    Beginning in 1951, Old DuPont began purchasing PFOA from 3M for use in the manufacturing process for Old DuPont's name-brand product Teflon®, commonly known for its use as a coating for non-stick cookware.

78.    Old DuPont has also used PFAS in other name-brand products such as Stainmaster®, and manufactured a variety of PFAS-containing products, such as fluorochemical-

based surfactants used in AFFF, including through a telomerization process that included, contained, degraded, or broke down into and/or generated PFOA.

79.     Although Old DuPont was fully aware that PFOA was an inherently dangerous and toxic chemical for decades, it produced its own PFAS compounds for use in its manufacturing processes, including its initiation of PFOA production as 3M phased out production of PFOA.

80.     Old DuPont marketed and promoted PFAS, and it shipped PFAS and PFAS-containing products to manufacturers throughout the United States, including Massachusetts. Old DuPont made enormous profits from PFAS and products containing PFAS and shipped PFAS and products containing PFAS to Massachusetts as well as throughout the country for decades, including with PFOA, which Old DuPont publicly claimed to have stopped manufacturing in 2013.

## 3M'S KNOWLEDGE OF THE DANGERS OF PFAS

81.     In the 1950s, based on its own internal studies, 3M concluded that PFAS are "toxic."

82.     3M knew as early as the mid-1950s that PFAS bioaccumulate in humans and animals.

83.     By the early 1960s, 3M understood that some PFAS are highly persistent in the environment, meaning that they do not degrade.

84.     3M knew as early as 1960 that chemical wastes from its PFAS manufacturing facilities that were dumped to landfills would leach into groundwater and otherwise enter the environment. A 3M internal memo from 1960 described the company's understanding that such wastes "[would] eventually reach the water table and pollute domestic wells."

85.     As early as 1963, 3M was aware that its PFAS products were persistent in the environment and would not degrade after disposal.

19

86.    3M began monitoring the blood of its employees for PFAS, as early as 1976, because 3M was concerned about health effects of PFAS.

87.    3M documents from 1977 relating to these worker tests further confirm that PFAS bioaccumulate.

88.    By at least 1970, 3M knew that its PFAS products were hazardous to marine life.

89.    One study of 3M's PFAS around this time had to be abandoned to avoid severe local pollution of nearby surface waters.

90.    In 1975, 3M found there was a "universal presence" of at least one form of PFAS in blood serum samples taken from across the United States.

91.    Because PFAS are not naturally occurring in any amount, anywhere on the planet, this finding unquestionably alerted 3M to the near inevitability that its products were a pathway for widespread public exposure to its toxic ingredient—a likelihood that 3M considered internally but did not share outside the company.

92.    This finding also alerted 3M to the likelihood that this PFAS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of this PFAS from 3M's products in human blood.

93.    According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M [No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)] ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS, as early as 1976, because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

94.    Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys.

95.    In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

96.    A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River.

97.    3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

98.    3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

99.    In 1983, 3M scientists opined that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

100.    In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.

101.    According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

102.    According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.

103.    The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

104.    A key priority of an internal 3M committee—referred to as the FC Core Team—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

105.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

106.    A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

107.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

108.    According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

109.    According to Professor Giesy's deposition transcript in the Minn. Lawsuit, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

110.    3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated that "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

111.    In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

112.    On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.

113.    On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."

114.    In a memo explaining its decision, EPA stated that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

115.    3M knew or should have known that through their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment in Massachusetts.

### OLD DUPONT'S KNOWLEDGE OF THE DANGERS

### OF PFAS AND MOUNTING LIABILITIES

116.    Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States.

117.    Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bioaccumulative, and biopersistent in the environment. Old DuPont also knew that it directly emitted and discharged, and continued to emit and discharge, PFOA in large quantities into the environment from its manufacturing plants, such that hundreds of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

118.    Old DuPont company scientists issued internal warnings about the toxicity associated with their PFAS products as early as 1961.

119.    Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

120.    In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFAS exposure.

121.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

122.    By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

123.    Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

24

124.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

125.    Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

126.    In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers confirming placental transfer of PFOA in humans.

127.    While Old DuPont knew about this toxicity danger as early as the 1960s, Old DuPont also was aware that PFAS was capable of contaminating the surrounding environment and causing human exposure.

128.    By at least 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

129.    By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent.

130.    Old DuPont was long aware that the PFOA it was releasing from its facilities was leaching into groundwater used for public drinking water.

131.    After obtaining data on these releases and the resulting contamination near Old DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

132.    Old DuPont employees who attended the 1984 Meeting discussed available technologies that could control and reduce PFOA releases from its manufacturing facilities, as well as potential replacement materials.

133.    Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

134.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

135.    They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."

136.    They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."

137.    By 2000, Old DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works facility in West Virginia.

138.    Old DuPont's own Epidemiology Review Board repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

139.    For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

140.    In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

141.    In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

142.    The combined settlement resolved eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

143.    Old DuPont also promised to phase out production and use of PFOA by 2015.

144.    EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."

145.    Old DuPont and Chemours knew or should have known that in their intended and/or common use products containing PFAS would very likely injure and/or threaten public health and the environment in Massachusetts.

146.    Also, in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled *Leach, et al. v. E. I. du Pont de Nemours & Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

147.    Under the terms of the final class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring

of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

148.    After seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

149.    More than 3,500 personal injury claims were filed against Old DuPont in Ohio and West Virginia following the final settlement in the *Leach* Action and the findings of the C8 Science Panel.

150.    These claims were consolidated in the federal multidistrict litigation styled *In Re: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio (the "C8 MDL").

151.    Between 2015 and 2016, juries in three bellwether trials in the C8 MDL returned multi-million-dollar verdicts against Old DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their cancers.

152.    As discussed below, Old DuPont required that Chemours both directly assume its historical PFAS liabilities and indemnify Old DuPont from those liabilities. Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [C8] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."

153.    On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the C8 MDL.

154.    In January 2021, Old DuPont and Chemours agreed to pay an additional $83 million to resolve additional cases that had been filed in the C8 MDL since the 2017 settlement.

**OLD DUPONT'S MULTI-STEP, FRAUDULENT SCHEME
TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM ITS
PFAS LIABILITIES AND HINDER CREDITORS**

155.    By 2013, Old DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to PFAS contamination at other sites and areas throughout the country, and its sale of products containing PFAS, and that its liability was likely billions of dollars.

156.    These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

157.    In light of this significant exposure, upon information and belief, by 2013 Old DuPont's management began to consider restructuring the company to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

158.    Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and The Old Dow Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

159.    Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

160.    Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from

its valuable tangible assets in order to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

161.     Old DuPont engaged in a three-part restructuring plan, further explained below.

162.     The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun-off" Chemours as a separate publicly traded entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

163.     Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

164.     Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit conduct with regard to PFAS.

165.     The second step involved Old DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

166.     Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

167.    The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

168.    The third step involved DowDuPont spinning off two, new, publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed New DuPont.

169.    As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

170.    New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

171.    Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and belief, Old DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like Plaintiff, where Old DuPont's valuable assets went and to hide the inadequate consideration that Old DuPont received in return.

**STEP 1: THE CHEMOURS SPINOFF**

172.    In February 2014, Old DuPont formed Chemours as a wholly owned subsidiary. Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

173.    On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

174.     Prior to July 1, 2015, Chemours was a wholly owned subsidiary of Old DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance Chemicals Business, consisting of Old DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, and Chemours became a separate, publicly traded entity.

175.     The Performance Chemicals Business included fluorochemical products and the business segment that had manufactured, used, and discharged PFOA into the environment.

176.     Prior to the Chemours Spinoff, Chemours was a wholly owned subsidiary of Old DuPont, and its Board of Directors had three members, all of whom were Old DuPont employees.

177.     On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Old DuPont's Board of Directors from 1998 to 2015.

178.     On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Old DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

179.     To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

180.     Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

181.     Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all of the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

182.    At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are not publicly available.

183.    Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

184.    Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

185.    Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. And, Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

186.    In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

187.    The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment from Washington Works and elsewhere.

188.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

189.    The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

190.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

191.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

192.    There was no meaningful, arms-length negotiation of the Separation Agreement.

193.    In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

194.    Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

195.    Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

196.    It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

197.    Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

198.    Shortly after the Chemours Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

199.    At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

200.    Removing Chemours' goodwill and other intangibles of $176 million yields tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

201.    Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

202.    Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

203.    Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

204.    **STEP 2: THE OLD DOW/OLD DUPONT "MERGER"**

205.    After the Chemours Spinoff, Old DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, and not with Old DuPont.

206.    Of course, Old DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

207.    Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Old DuPont moved to the next phase of its fraudulent scheme.

208.    On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

209. To effectuate the transaction, Old DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., (*i.e.*, New DuPont) and (ii) the creation of two new merger subsidiaries into which Old Dow and Old DuPont each would merge.

210. Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

211. Although Old DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Old DuPont's historical PFAS liabilities. Rather, Old DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

212. The below image reflects the corporate organization following the "merger":



## STEP 3: THE SHUFFLING, REORGANIZATION, AND TRANSFER OF VALUABLE ASSETS AWAY FROM OLD DUPONT AND SEPARATION OF CORTEVA AND NEW DOW

213.    Following the Dow-DuPont Merger, DowDuPont (*i.e.*, New DuPont) underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Old DuPont's assets out of the company.

214.    While, again, the details of these transactions remain hidden from Plaintiff and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (*i.e.*, New DuPont) was in preparation for the conglomerate being split into three, separate, publicly traded companies.

215.    Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (*i.e.*, New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

216.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (*i.e.*, New DuPont), for far less than the assets were worth.

217.    Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (*i.e.*, New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont (*i.e.*, New DuPont) retained the Specialty Products Business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

218.    The below graph depicts the structure of DowDuPont after the internal reorganization and realignment:



219.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont (*i.e.*, New DuPont) (the "DowDuPont Separation Agreement").

220.    The Dow DuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

221.    Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

222.    Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

223.    This "allocation" applies to Old DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals business, including Plaintiff's claims in this case.

224.    While New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, New DuPont and Corteva each assumed these liabilities under the

DowDuPont Separation Agreement, along with other liabilities related to Old DuPont's discontinued and divested businesses. Plaintiff can therefore bring claims against New DuPont and Corteva directly for Old DuPont's infiltration of the groundwater and surface water within Plaintiff's Water System.

225.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (*i.e.*, New DuPont) distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

226.    On or about May 2, 2019, DowDuPont (*i.e.*, New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Corteva as an independent public company.

227.    Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now also trades on the NYSE under the stock ticker "CTVA."

228.    The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont (*i.e.*, New DuPont) stockholders as a pro rata dividend.

229.    The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below:



230.    Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. (*i.e.*, New DuPont).

### THE EFFECT OF THE YEARS-LONG SCHEME TO DEFRAUD PLAINTIFF AND OTHER CREDITORS AND AVOID FINANCIAL RESPONSIBILITY FOR LEGACY LIABILITIES

231.    The net result of these transactions was to strip away valuable tangible assets from Old DuPont and transfer those assets to New DuPont and Corteva for far less than the assets are worth.

232.    Old DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Corteva separation was complete, a portion of this "goodwill" was assigned to Old DuPont in order to prop up its balance sheet. But, in reality, Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

233.    In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

234.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

235.    Additionally, Old DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Old DuPont reported EBT of negative $422 million.

236.    The value of Old DuPont's tangible assets further underscores Old DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

237.    That means in the five-year period over which the restructuring occurred, when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

238.    As of September 2019, just after the Corteva spinoff, Old DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

239.    At the same time, Old DuPont reported liabilities totaling $22.060 billion. Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

240.    Old DuPont's financial condition has continued to deteriorate. By end of fiscal year 2019, Old DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same period totaled $21.869 billion.

241.    Old DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, whereby Old DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

242.    In addition, Plaintiff cannot take comfort in the "allocation" of liabilities to New DuPont and Corteva. Neither of those Defendants has publicly conceded that they assumed Old DuPont's historical PFAS liabilities. And it is far from clear that either entity will be able to satisfy any judgment in this case.

243.    Indeed, New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

244.    New DuPont has received or will receive significant proceeds on the sales of Old DuPont's former business segments and product lines.

245.    In September 2019, New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

246.    On or about December 15, 2019, New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

247.    In March 2020, New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

248.    In addition, New DuPont has issued Notices of Intent to Sell relating to six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

249.    Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. But Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## FIRST CAUSE OF ACTION
### Strict Product Liability Based on Design Defect
### (By Plaintiff against all Defendants)

250.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully restated in this cause of action.

251.    Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing, and/or selling Fluorochemical Products.

252.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of Fluorochemical Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

253.     At the time of manufacture, Defendants knew that the chosen formulation(s) of Fluorochemical Products was not biodegradable, would bioaccumulate in humans and wildlife, and was toxic to humans and the environment.

254.     Defendants were also aware and/or in possession of an available safer design that was functional and reasonably priced.

255.     Defendants were also aware that their Fluorochemical Products, when sold would infiltrate Plaintiff's wells and the groundwater and cause damages.

256.     Defendants' Fluorosurfactant Products were manufactured for placement into trade or commerce.

257.     On information and belief, the Fluorochemical Products as manufactured and/or sold by Defendants reached Plaintiff's wells without substantial change in its condition and was used by consumers, local manufacturers, local fire training academies, local fire departments, and airports, among others, in a reasonably foreseeable and intended manner.

258.     The Fluorochemical Products, as manufactured and/or sold by the Defendants, were "defective" and "unreasonably dangerous" when they left the Defendants' control, entered the stream of commerce, and were received by consumers, manufacturers, firefighting training academies, local fire departments, and airports, among others because it was dangerous to an extent beyond that which would be contemplated by the ordinary user.

259.     The Fluorochemical Products Defendants manufactured and/or sold were defective in design because, even when used as intended and directed by Defendants, they can result in the contamination of soil and groundwater with PFOA and/or PFOS creating a significant threat to groundwater and drinking water supplies.

260.    The Fluorochemical Products Defendants manufactured did not meet a consumer's reasonable expectation as to their safety because of the propensity to contaminate soil and groundwater when used as intended.

261.    Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time Defendants introduced Fluorochemical Products containing PFOA and/or PFOS into the stream of commerce.

262.    The specific risk of harm in the form of soil, groundwater, and drinking water contamination from Fluorochemical Products containing PFOA and/or PFOS that Defendants manufactured and/or sold was reasonably foreseeable or discoverable by Defendants.

263.    The design, formulation, manufacture and/or distribution and sale of Fluorochemical Products containing PFOA and/or PFOS that were known to be toxic and extremely mobile and persistent in the environment was unreasonably dangerous.

264.    Fluorochemical Products' failure to perform safely was a proximate cause of Plaintiff's damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

### SECOND CAUSE OF ACTION
### Strict Products Liability Based on Failure to Warn
### (By Plaintiff against all Defendants)

265.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

266.    The use of Fluorochemical Products in the capture zone and in proximity to Plaintiff's wells for consumer use, manufacturing, training of fire personnel, firefighting, and

disposal in landfills was a reasonably foreseeable use. Defendants knew or should have known that Fluorochemical Products used in this manner can contaminate soil, surface water, stormwater and groundwater with PFOA and/or PFOS, creating a significant threat to human health and the environment.

267.    It was foreseeable that PFOA and/or PFOS from the Fluorochemical Products that Defendants manufactured and sold would enter the environment, resulting in the infiltration of drinking water supplies that rely upon groundwater as a source, including Plaintiff's wells.

268.    Defendants knew or should have known of the risks posed by their Fluorochemical Products.

269.    The ordinary consumer—whether residential, industrial, municipal or otherwise—, would not have known or appreciated the risk of contamination from ordinary use and disposal of Defendants' Fluorochemical Products without an appropriate warning.

270.    Defendants had a duty to warn the users of Fluorochemical Products of these hazards.

271.    Defendants, however, failed to provide adequate warnings of these hazards.

272.    Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFOA and/or PFOS affected the market's acceptance of these products containing PFOA and/or PFOS.

273.    Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFOA and/or PFOS prevented the users of the product from treating it differently with respect to its use and environmental cleanup.

274.    Defendants' failure to issue the proper warnings related to Fluorochemical Products containing PFOA and/or PFOS prevented the users of the product from seeking alternative products, including but not limited to, using alternative products for purposes of training.

275.    Defendants' action in placing Fluorochemical Products containing PFOA and/or PFOS into the stream of commerce without an appropriate warning as to use and disposal was a direct and proximate cause of Plaintiff's injury.

276.    As a direct and proximate result of the Defendants' failure to warn, Plaintiff has suffered damage, requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

### THIRD CAUSE OF ACTION
### Negligence
### (By Plaintiff against all Defendants)

277.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

278.    Defendants had a duty to Plaintiff to manufacture and/or market, distribute, and sell their Fluorochemical Products in a manner that avoided impacts to the environment and drinking water supplies and avoided harm to those who foreseeably would be injured by the PFOA and/or PFOS contained in Defendants' Fluorochemical Products.

279.    The use, including the disposal of, Defendants' Fluorochemical Products by consumers, manufacturers, local fire training academies, fire departments, airports and others was a reasonably foreseeable use. Defendants knew or should have known that their Fluorochemical Products used and disposed of in this manner would contaminate soil and groundwater with PFOA and/or PFOS, creating a significant threat to human health and the environment. Defendants had a

duty to prevent the release into the environment of PFOA and/or PFOS, in the foreseeable uses of their Fluorochemical Products.

280.    Defendants breached their duties when they negligently manufactured a dangerous product, negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used and/or disposed of in a manner such as to result in the contamination of soil and groundwater.

281.    Defendants, including but not limited to 3M, also negligently discharged their Fluorochemical Products, byproducts, precursors, and raw PFOS and PFOA materials during their own manufacturing processes within the proximity of Plaintiff's drinking water supply wells.

282.    As a direct and proximate result of Defendants' breaches of their duties, Defendants caused Plaintiff to suffer actual losses. Specifically, Plaintiff suffered damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

## FOURTH CAUSE OF ACTION
### Continuing Trespass
### (By Plaintiff against all Defendants)

283.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

284.    Plaintiff owns, possesses, and actively exercises rights to extract and use groundwater drawn from its drinking water supply wells..

285.    The Defendants were engaged in the business of researching, designing, formulating, handling, training, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, and/or otherwise being responsible for Fluorochemical Products

51

and knew or should have known that the subsequent and foreseeable use and disposal of these products would infiltrate the groundwater and drinking water supply wells. Thus, the Defendants intentionally, recklessly, negligently or as the result of engaging in an extra-hazardous activity caused noxious and hazardous contaminants and pollutants to enter the surface water, stormwater, groundwater, and drinking water supplies.

286.    Fluorochemical Products and PFAS compounds manufactured and/or supplied by the Defendants continue to be located in the drinking water supply within Plaintiff's drinking water supply system including the groundwater that supplies water to Plaintiff's drinking water supply wells.

287.    Plaintiff did not, and do not, consent to the trespass alleged herein. The Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

288.    The infiltration of Plaintiff's surface water, stormwater, groundwater, and wells alleged herein has not yet ceased. PFAS continue to migrate into and enter groundwater within Plaintiff's drinking water supply wells.

289.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, the surface water, stormwater, groundwater, and drinking water supply have been, and continue to be, infiltrated with PFAS, causing Plaintiff significant injury and damage.

290.    As a direct and proximate result of these Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, monitoring, and disposal costs and expenses related to the impacts to groundwater within Plaintiff's drinking waters supply system in an amount to be proved at trial.

291.    As a further direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff seeks the value of the use of its property for the time of the wrongful

occupation, the reasonable costs of repair or restoration of all of Plaintiff's property to its original condition, costs associated with recovering the possession, any benefits or profits obtained by Defendants related to the trespass. The Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including infiltration of drinking water supplies with PFAS. The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of and maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment, including groundwater within Plaintiff's drinking water supply system. Therefore, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

### FIFTH CAUSE OF ACTION
### Public and Private Nuisance
### (By Plaintiff against all Defendants)

292.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

293.    Plaintiff is the owner of land, easements, and/or water rights which permit it to extract groundwater for use in its drinking water supply system.

294.    The actions of the Defendants as alleged herein, have resulted in the continuing impacts to Plaintiff's drinking water supply wells and the groundwaters that supply them by PFAS, and such infiltration is a public nuisance and is reasonably abatable and varies over time. Each Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

295.    The actions of the Defendants constitute a nuisance in that the impacts to groundwater and drinking water is injurious to public health, is indecent or offensive to the senses and is an obstruction to the Plaintiff's free use of their property, so as to interfere with the comfortable enjoyment of life or property. The infiltration of Plaintiff's drinking water supplies significantly affects, at the same time, a considerable number of people in an entire community.

296.    Each Defendant has caused, maintained, assisted and/or participated in such nuisance, and is a substantial contributor to such nuisance.

297.    By its design, the Defendants' Fluorochemical Products were known by Defendants to contain compounds that would likely be discharged to the environment in a manner that would create a nuisance and further failed to properly instruct intermediaries and end-users to properly use and dispose of such contaminants in such a manner as to avoid creating or contributing to a nuisance.

298.    The Defendants knew, or should have known, of the harmful effects and adverse impacts that exposure to PFOA and/or PFOS would have on the environment and human health.

299.    The Defendants caused or contributed to the creation of the nuisance at issue by directing and instructing intermediaries and end users of its products to dispose of products and materials containing PFOA and PFOS in a manner that the Defendants knew or should have known would result in impacts to soil and groundwater and ultimately impact drinking water.

300.    Plaintiff did not and does not consent to the public nuisance alleged herein. Defendants knew or reasonably should have known that Plaintiff would not consent to this public nuisance.

301.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff's drinking water supply wells and the groundwaters that supply them have been, and continue to be, infiltrated with PFAS, causing Plaintiff significant injury and damage.

302.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur, investigation, treatment, remediation, and monitoring costs and expenses related to the PFAS in an amount to be proved at trial.

303.    Furthermore, as a direct and proximate result of the Defendants' acts and omissions as alleged herein, the infiltration of groundwater and drinking water supplies constitutes an ongoing public nuisance.

304.    The Defendants are jointly and severally responsible to take such action as is necessary to abate the public nuisance and to take such action as is necessary to ensure that the PFAS that impact the aquifer and other water resources supplying water to the Plaintiff's Water System do not present a risk to the public.

305.    Plaintiff has been damaged because the Defendants' acts and omissions, have unreasonably interfered with, and continue to interfere with, Plaintiff's use and enjoyment of its public water supply systems and has suffered and continues to suffer significant damages and injuries, including but not limited to, incurring costs related to the investigation, sampling, treatment system design, acquisition, installation, operations and maintenance, and other costs and damages related to the detection and remediation of the PFAS impacting its water supply systems.

306.    The Defendants knew and/or should have known that it was substantially certain that their alleged acts and omissions described in this Complaint would cause injury and damage, including infiltration of drinking water supplies with PFAS.

307.    The Defendants knew with substantial certainty at the time of their manufacture and sale of fluorosurfactants, fluorochemicals, and containing PFAS that their products would result in infiltration of Plaintiff's drinking water resources.

308.    The Defendants' acts and omissions were substantially certain to and did result in an unreasonable interference with Plaintiff's wells.

309.    As a direct and proximate result of the Defendants' acts and omissions, the Defendants caused Plaintiff to suffer actual losses.

310.    The Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of Fluorochemical Products, fluorosurfactants, and fluorochemicals to maximize profits, in conscious disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon health, property, and the environment.

311.    Specifically, Plaintiff suffered damage requiring investigation, clean-up, abatement, remediation, and monitoring costs and suffered other damages in an amount to be determined at trial.

312.    Additionally, Plaintiff also requests an award of exemplary damages in an amount that is sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

### SIXTH CAUSE OF ACTION
### Declaratory Relief
### (By Plaintiff against All Defendants)

313.    Plaintiff repeats and restates the allegations set forth in all previous paragraphs of this Complaint as if fully set forth herein.

314.    Defendants knew, or should have known, that their Fluorochemical Products, when used in a foreseeable and intended manner, were dangerous and created an unreasonable and excessive risk of harm to human health and the environment.

315.    Defendants intentionally, willfully, deliberately and/or negligently failed to properly warn, train, handle, control, dispose, and release noxious and hazardous contaminants and pollutants, such that Defendants created substantial and unreasonable threats to human health and the environment, which resulted from the foreseeable and intended use and storage of Fluorochemical Products and products containing fluorosurfactants and fluorochemicals.

316.    Among other things, Plaintiff must take costly remedial action to remove PFAS impacts which will result in substantial costs, expenses, and damages in an amount to be proved at trial.

317.    These Defendants, and each of them, have failed to reimburse Plaintiff for the cost of investigation, remediation, cleanup, and disposal costs and/or deny any responsibility or liability for these damages and expenses Plaintiff will incur in the future.

318.    An actual controversy exists concerning who is financially responsible for abating actual or threatened pollution or infiltration of groundwater resources and Plaintiff's drinking water supply wells by PFAS.

319.    In order to resolve this controversy, Plaintiff seeks an adjudication of the respective rights and obligations of the parties, and other relief to the extent necessary to provide full relief.

**SEVENTH CAUSE OF ACTION**
**M.G.L. ch. 40 § 39G**
**(By Plaintiff against All Defendants)**

320.    Plaintiff repeats and restates the allegation set forth in the previous paragraphs as if fully set forth herein.

321.    Pursuant to Mass. Gen. Laws ch. 40 § 39G:

Whoever willfully or wantonly corrupts, pollutes or diverts any of the waters taken or held under said sections thirty-nine A to thirty-nine E, inclusive, or injures any structure, work or other property owned, held or used by a town under the authority and for the purposes of said sections, shall forfeit and pay to said town three times the amount of damages assessed therefor, to be recovered in an action of tort; and upon conviction of any one of the above willful or wanton acts shall be punished by a fine of not more than $5,000 or by imprisonment in state prison for not more than 5 years or in the house of correction for not more than 2 years or by both such fine and imprisonment.

322.    As set forth above, Defendants negligently, knowingly, willfully, and wantonly distributed products they knew would infiltrate public water resources when used as intended and as instructed.

323.    Defendants are therefore liable pursuant to Mass. Gen. Laws ch 40 §39G for treble damages.

## EIGHTH CAUSE OF ACTION
### (Actual Fraudulent Transfer In Relation to Chemours Spinoff – As Against Old DuPont, Chemours, Corteva, and New DuPont)

324.    Plaintiff repeats and restates the allegation set forth in the previous paragraphs as if fully set forth herein.

325.    Plaintiff seeks equitable and other relief pursuant to the UFTA against Old DuPont and Chemours and was a creditor of Chemours at all relevant times.

326.    Through its participation in the Chemours Spinoff, as detailed above, Chemours transferred valuable assets to Old DuPont, including the $3.9 billion dividend (the "Chemours Transfers"), while simultaneously assuming significant liabilities pursuant to the Chemours Separation Agreement (the "Chemours Assumed Liabilities").

327.    The Chemours Transfers and Chemours Assumed Liabilities were made for the benefit of Old DuPont.

328.    At the time that the Chemours Transfers were made and Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

329.    Old DuPont and Chemoursacted with the actual intent to hinder, delay and defraud creditors or future creditors.

330.    Plaintiff has been harmed as a result of the Chemours Transfers.

331.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and Massachusetts General Law Chapter 109A, Plaintiff is entitled to void the Chemours Transfers and to recover property or value that Chemours transferred to Old DuPont.

332.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

**NINTH CAUSE OF ACTION**
**(Constructive Fraudulent Transfer in Relation to Chemours Spinoff – As Against Old DuPont, Chemours, Corteva, and New DuPont)**

333.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

334.    Plaintiff seeks equitable and other relief pursuant to the UFTA against Old DuPont and Chemours and was a creditor of Chemours at all relevant times.

335.    Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the Chemours Transfers and Chemours Assumed Liabilities.

336.    Each of the Chemours Transfers and Chemours' assumption of the Chemours Assumed Liabilities was made to or for the benefit of Old DuPont.

337.    At the time that the Chemours Transfers were made and the Chemours Assumed Liabilities were assumed, and until the Chemours Spinoff was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours.

338.    Chemours made the Chemours Transfers and assumed the Chemours Assumed Liabilities when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business and debt obligations.

339.    Chemours was insolvent at the time or became insolvent as a result of the Chemours Transfers and its assumption of the Chemours Assumed Liabilities.

340.    At the time that the Chemours Transfers were made and Chemours assumed the Chemours Assumed Liabilities, Old DuPont and Chemours intended Chemours to incur, or believed, or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

341.    Plaintiff has been harmed as a result of the Chemours Transfers.

342.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and Massachusetts General Law Chapter 109A, Plaintiff is entitled to void the Chemours Transfers and to recover property or value transferred to Old DuPont.

343.    Upon information and belief, Corteva and New DuPont assumed Old DuPont's liability described above.

### TENTH CAUSE OF ACTION
### (Actual Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations – As Against Old DuPont, New DuPont, and Corteva)

344.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

345.    Plaintiff seeks equitable and other relief pursuant to the UFTA against Old DuPont, New DuPont, and Corteva and was a creditor of Old DuPont at all relevant times.

346.    Following the Dow-DuPont Merger, and through the separations of New DuPont, New Dow, and Corteva, Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva and New DuPont (the "Old DuPont Transfers").

347.    The Old DuPont Transfers were made for the benefit of New DuPont or Corteva.

348.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

349.    Old DuPont, New DuPont, and Corteva acted with the actual intent to hinder, delay, and defraud creditors or future creditors.

350.    Plaintiff has been harmed as a result of the Old DuPont Transfers.

351.    Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties such as the Plaintiff that have been damaged as a result of the actions described in this Complaint.

352.    Pursuant to Del. Code. Tit. 6 Sec. 1301 to 1312 and Massachusetts General Law Chapter 109A. Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of Plaintiff.

## ELEVENTH CAUSE OF ACTION
**(Constructive Fraudulent Transfer In Relation to Dow-DuPont Merger and Subsequent Restructurings, Asset Transfers and Separations – As Against Old DuPont, New DuPont, and Corteva)**

353.    Plaintiff repeats and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

354.    Plaintiff seeks equitable and other relief pursuant to the UFTA against Old DuPont, New DuPont, and Corteva, and Plaintiff is and was a creditor of Old DuPont at all relevant times.

355.    Old DuPont did not receive reasonably equivalent value from New DuPont and Corteva in exchange for the Old DuPont Transfers.

356.    Each of the Old DuPont Transfers was made to or for the benefit of New DuPont or Corteva.

357.    At the time that the Old DuPont Transfers were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

358.    Old DuPont made the Old DuPont Transfers when it was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

359.    Old DuPont was insolvent at the time or became insolvent as a result of the Old DuPont Transfers.

360.    At the time that the Old DuPont Transfers were made, Old DuPont, New DuPont, and Corteva intended to incur, or believed, or reasonably should have believed that Old DuPont would incur debts beyond its ability to pay as they became due.

361.    Plaintiff has been harmed as a result of the Old DuPont Transfers.

362.    Under Del. Code. Tit. 6 Sec. 1301 to 1312 and Massachusetts General Law Chapter 109A, Plaintiff is entitled to void the Old DuPont Transfers and to recover property or value transferred to New DuPont and Corteva.

363.    Pursuant to Del. Code. Tit. 6 Sec. 1301 to 1312 and Massachusetts General Law Chapter 109A. Plaintiff also seeks to enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any

business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and seeks a constructive trust over such proceeds for the benefit of Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Enter judgment in its favor and against Defendants on each Count of this Complaint;

B.    An order that Defendants pay all damages suffered by Plaintiff, including but not limited to investigation, clean-up, abatement, remediation, monitoring and operation and maintenance costs incurred by Plaintiff, or for which Plaintiff is or was legally responsible, to comply with the MMCL and groundwater and soil cleanup target levels;

C.    An order that Defendants are required to abate the nuisance Defendants have caused;

D.    An order voiding the Chemours Transfers and the DuPont Transfers to the extent necessary to satisfy Plaintiff's claims;

E.    An order enjoining New DuPont from distributing, transferring, capitalizing, or otherwise transferring any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont;

F.    An order imposing a constructive trust over any such proceeds for the benefit of the Plaintiff;

G.    An award to Plaintiff for the costs of this suit (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

H.    An award for punitive damages; and

I.      An award for such other and further relief as the nature of this case may require or as this court deems just, equitable and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial.

Respectfully submitted,
By Its Attorneys,

January 19, 2023                           /s/ *Kenneth A. Sansone*

Kenneth A. Sansone
Michael P. DiGiannantonio
SL ENVIRONMENTAL LAW GROUP PC
175 Chestnut Street
San Francisco, CA 94133
Telephone: (415) 625-1733
Facsimile: (415) 384-8333
mdigiannantonio@slenvironment.com
ksansone@slenvironment.com

Kevin J. Madonna
KENNEDY & MADONNA, LLP
48 Dewitt Mills Road Hurley, NY 12443
Telephone: (845) 481-2622
Facsimile (845) 230-3111
kmadonna@kennedymadonna.com

Michael A. London
Gary J. Douglas
Rebecca G. Newman
Tate J. Kunkle
DOUGLAS & LONDON, P.C.
59 Maiden Ln, 6th Fl,
New York, NY 10038
Telephone: (212) 566-7500
gdouglas@douglasandlondon.com
mlondon@douglasandlondon.com
rnewman@douglasandlondon.com
tkunkle@douglasandlondon.com

Ned McWilliams
LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN &
MOUGEY, P.A.
316 S. Baylen St.
Pensacola, Florida 32502
Telephone: (850) 435-7138
nmcwilliams@levinlaw.com

Robert A. Bilott
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Telephone: 513-381-2838
Fax: 513-381-0205
Email: bilott@taftlaw.com